**GIBSON COUNTY FARM BUREAU COOPERATIVE ASSOCIATION, INC., Appellant–Plaintiff,**

v.

**Norman GREER, Judgment Defendant,**

**Miles, Inc. d/b/a Miles Farm Center, Appellee–Defendant.**

**No. 26A01–9305–CV–157.**

Court of Appeals of Indiana, First District.

Oct. 25, 1993.

Christopher E. Baker, Rubin & Levin, Indianapolis, James G. McDonald, McDonald & McDonald, Princeton, for appellant.

C. Dean Higginbotham, Princeton, for appellee.

BAKER, Judge.

Today we consider what the consequences are between competing creditors when one creditor only filed a UCC–1 financing statement and the other creditor has a judgment lien.

Appellant-plaintiff Gibson County Farm Bureau Cooperative Association, Inc. (Farm Bureau), appeals the trial court's judgment that appellee-defendant Miles, Inc., d/b/a Miles Farm Center (Miles) had a prior perfected security interest in a $9,995.35 check issued by Consolidated Grain & Barge, Inc. (Consolidated) to Norman Greer and others and thus an interest superior to Farm Bureau's judgment lien.

The sole issue Farm Bureau presents for our review is whether the trial court correctly applied the law to the undisputed facts when it determined that Miles had a security interest in the check which was superior to Farm Bureau's interest.

## FACTS

The undisputed facts are that in 1991, Norman Greer, who was engaged in farm-

ing operations in Gibson County, financed his corn and soybean crops through Miles. On May 21, 1991, Greer executed a financing statement[1] identifying himself as the debtor, Miles as a secured party, and "[a]ll corn and soybeans, presently growing, or to be planted on the following farms, and not limited to, including any additional acreage cultivated in 1991 (See exhibit A)" as collateral. Record at 50. The UCC–1 financing statement also included the addresses of both parties. Exhibit A identified by legal description, the Gibson County real estate on which the collateral was growing or was to be planted. Record at 51. Greer signed both the UCC–1 financing statement and Exhibit A.

On June 19, 1991, Miles filed the UCC–1 financing statement with Exhibit A attached in the office of the recorder of Gibson County, Indiana. On October 8, 1991, Greer sold some of his harvested corn and soybeans to Consolidated which issued a check dated October 8, 1991, jointly payable to "Norman Greer & Miles Farm Supply, Inc./Miles Farm Center & Princeton Farms & Gibson County Farm Bureau." Record at 20. Consolidated gave the check to Greer. Greer indorsed the check and delivered it to Miles. Princeton Farms agreed to indorse the check, but Farm Bureau refused, disputing Miles priority to the proceeds of the check. Miles retains possession of the check, but the funds represented by the check remain in Consolidated's checking account.

On March 9, 1992, Farm Bureau obtained an in personam judgment against Greer in the amount of $36,667.67, with legal interest accruing. Farm Bureau then filed a lis pendens notice pursuant to Ind. Trial Rule 63.1(C) in the Gibson County Clerk's office on all Greer's crops and proceeds to perfect its security interest against Greer. However, we note that Farm Bureau's 1992 judgment did not attach to the proceeds from the sale of Greer's crops in 1991 represented by the check until Miles was

served with a summons in the proceedings supplemental.

On March 18, 1992, Farm Bureau filed a verified motion for proceedings supplemental naming Consolidated as a garnishee defendant and seeking to collect on its judgment. On April 1, 1992, Consolidated answered indicating that it had one outstanding check dated October 8, 1991, in the sum of $9,995.33 payable to Greer, Miles, Princeton Farms, and Farm Bureau.

On July 27, 1992, Farm Bureau filed a verified motion for proceedings supplemental naming Miles as an additional garnishee defendant. Farm Bureau acquired and perfected a lien on the proceeds represented by the check and became a judgment lien creditor with respect to the check when Miles was served with a summons. Farm Bureau simultaneously filed a motion to determine priority of claimants. On September 28, 1992, Miles answered Farm Bureau's interrogatories by indicating it was holding the $9,995.33 check. Miles further asserted that it had a claim against Greer in excess of $17,000.00 based on an unpaid account.

At a September 29, 1992 hearing, Farm Bureau and Miles stipulated the facts and the trial court ordered the parties to submit briefs. On January 28, 1993, the trial court entered judgment stating:

> "The Court finds that while there was not a document specifically designated a security agreement, that nevertheless, the notice requirements of Indiana Code 26–1–9–203 were met by the filing of the UCC–1 Financing Statement and that debtor had, in fact, signed the document which did contain a description of the land on which the collateral, i.e., growing crops, were located, value had been given, and the debtor had rights in the collateral. The Court thus finds that [Farm Bureau] had effective notice of the security interest of Miles as required by law." Record at 60.

---

1. The financing statement was the standard form prescribed in IND.CODE 26–1–9–402, also known as the UCC–1 financing statement.

The trial court held that Miles had a perfected security interest in the $9,995.35 check superior to Farm Bureau's interest as a judgment lien creditor. The court then ordered Farm Bureau to indorse the check to the favor of Miles. Farm Bureau now appeals.[2]

## DISCUSSION AND DECISION

### I. Standard of Review

Farm Bureau's only claim is that the trial court's judgment is contrary to law. Both parties agree that the facts are not in controversy.

■ Where the appellant challenges the trial court's judgment as contrary to law and does not challenge the factual findings, we accept the findings as true and look to the findings only to determine whether they support the judgment. *City of Evansville v. Old State Utility Corp.* (1990), Ind.App., 550 N.E.2d 1339, 1341, n. 1. We will reverse if the trial court erred in its application of the law. *See Trook v. Lafayette Bank and Trust Co.* (1991), Ind. App., 581 N.E.2d 941, 944, *trans. denied.*

### II. The Uniform Commercial Code

■ First, we note that this case is governed by IND.CODE 26–1–9, Uniform Commercial Code–Secured Transactions (UCC), because the UCC applies to all such transactions, regardless of form. *See* I.C. 26–1–9–102. The UCC's requirements are controlling in determining whether a valid security interest has been created and perfected. *International Harvester Credit Corp. v. Pefley* (1983), Ind.App., 458 N.E.2d 257.

### III. Miles' Security Interest

Farm Bureau contends the trial court misapplied the UCC. Specifically, Farm Bureau claims the trial court erred in finding that the UCC–1 financing statement executed by Greer and Miles also served as a security agreement between them. Farm Bureau argues that Greer and Miles never executed a security agreement, so Miles did not have a security interest in Greer's crops and did not have priority over Farm Bureau's judgment.

### A. A Sufficient Financing Statement

■ First, we must determine if Miles had a security interest which was enforceable against Greer or Farm Bureau. A security interest is an interest in personal property or fixtures which secures payment or performance of an obligation. I.C. 26–1–1–201(37). A security agreement is an agreement which creates or provides for a security interest. I.C. 26–1–9–105(1)(h).

■ In the present case, Greer and Miles did not execute a document labeled a security agreement. The only document executed was a UCC–1 financing statement and its attachment, Exhibit A. Greer signed the UCC–1 financing statement which listed his name and address in the space provided for information on the debtor. Miles' name and address appear in the space provided for information on the secured party. Typewritten in the space provided for information regarding the types of property covered by the financing statement was "[a]ll corn and soybeans, presently growing, or to be planted on the following farms, and not limited to, including any additional acreage cultivated in 1991. (See exhibit A)." Record at 50. Exhibit A listed the legal descriptions of the real estate where the crops were growing or to be planted.[3]

■ To comply with the statutory requirements, a financing statement covering crops must contain the names and addresses of the debtor and secured party, a description of the collateral and the real estate concerned, and must be signed by the debtor. *See* I.C. 26–1–9–402; *Citizens National Bank of Evansville v. Wedel* (1986), Ind.App., 489 N.E.2d 1203 at 1206. Thus the UCC–1 financing statement and Exhibit A collectively constitute a standard form

2. The parties presented their oral arguments to this court on September 29, 1993.

3. Instruction 4 of the UCC–1 form states that if the space provided for any item is inadequate, additional sheets may be attached. Record at 50. Therefore, Exhibit A was a proper attachment to the financing statement.

UCC–1 financing statement and satisfy the minimum requirements for a financing statement covering crops.[4]

## B. Perfection

■ The existence of a UCC–1 financing statement does not mean an enforceable security interest exists. Before a security interest is enforceable against a debtor, it must attach to the collateral. No security interest attaches to collateral until the debtor signs a security agreement containing a description of the collateral, the debtor grants a security interest, value is given, and the debtor has rights in the collateral. See I.C. 26–1–9–203(1).[5]

■ Before a security interest is effective against third parties, it must have attached and be perfected. I.C. 26–1–9–303. Perfection is a step in addition to attachment, which requires the creditor to file a financing statement or take possession of the collateral. See I.C. 26–1–9–302; Citizens National Bank of Evansville v. Wedel (1986), Ind.App., 489 N.E.2d 1203, 1205.

■ Here, Miles properly filed the financing statement with the Gibson County Recorder's office, the county where both Greer and the real estate on which his crops were growing or were to be grown. See I.C. 26–1–9–401. Filing a financing statement in the proper place perfects a security interest. See I.C. 26–1–9–401.[6] A party may file a financing statement before a security agreement is made or a security interest otherwise attaches. I.C. 26–1–9–402(1). However, perfection in the absence of a possessory security interest or a written security agreement accomplishes nothing, and the security interest is not enforceable against the debtor or third parties. See I.C. 26–1–9–203(1); see also In re R. & L. Cartage & Sons, Inc., 118 B.R. 646, 649 (Bankr.N.D.Ind.1990); Matter of Hillman, 94 B.R. 18, 21 (Bankr.D.Conn.1988).

Thus, Miles' secured status and its priority over or subordination to Farm Bureau is ultimately determined by the validity of an underlying security agreement. See I.C. 26–1–9–203(1). Without a writing satisfying the requirements of a security agreement, there is no enforceable security interest against anyone, not even the debtor. Therefore, we must determine if the financing statement here met the requirements of I.C. 26–1–9–203(1) so that it could also serve as a security agreement between Greer and Miles.

## C. Financing Statement as a Security Agreement

There are no Indiana cases directly on point that have addressed the issue of whether a financing statement alone con-

---

**4.** Since the standard form UCC–1 financing statement was the only document executed in this case, we will not address the applicability of the composite document rule. The composite document rule, which is followed in some states, simply allows a court to look to all the documents executed by the parties in order to find that the requirements of an enforceable security agreement were met, including the requirement that the debtor's intent to create a security interest in the creditor be expressed in writing. See Evans v. Everett, 279 N.C. 352, 183 S.E.2d 109 (1971) (financing statement declaring it covered crops and the same secured a note for advanced money to produce crops together with a promissory note stating it was secured by UCC financing statement held to meet the UCC's minimum requirements and could double as a security agreement).

**5.** See also Thrift, Inc. v. A.D.E., Inc. (1983), Ind. App., 454 N.E.2d 878, 881; Cargill, Inc. v. Perlich (1981), Ind.App., 418 N.E.2d 274, 278. The formal requisites for a security agreement are reduced to a minimum and are not only condi-

tions for enforceability of a security interest but are also in the nature of the Statute of Frauds. See Official Comments of I.C. 26–1–9–203. The purpose of I.C. 26–1–9–203 is not notice to third parties, as indicated by the trial court. Notice requirements are provided in I.C. 26–1–9–401 and I.C. 26–1–9–402.

Absent a writing satisfying the simple requirements of I.C. 26–1–9–203(1), a security interest is not enforceable against even the debtor. A security agreement is aptly described as a contract between the debtor and creditor indicating the debtor's grant to the creditor of a security interest in some collateral.

**6.** I.C. 26–1–9 adopts the system of notice filing. See Official Comments to 26–1–9–402. The purpose of I.C. 26–1–9–401 (where to file) and I.C. 26–1–9–402 (what to file) in requiring a creditor to file a financing statement in the proper place is to indicate to file searchers that the party who filed the financing statement may have a security interest in the collateral described and that third parties should inquire further to determine the complete state of affairs. Id.

tains the requisite elements of an enforceable security agreement. Therefore, we will refer to the manner in which other jurisdictions have addressed the issue.

Although the UCC distinguishes between a security agreement and a financing statement, it does not prohibit the combination of a security agreement and financing statement. *See* I.C. 26–1–9–203(1) and I.C. 26–1–9–402.[7] In fact, I.C. 26–1–9–402(1) specifically provides that a copy of a security agreement is sufficient as a financing statement if it contains the information required for a financing statement and is signed by both parties. It logically follows that a financing statement may serve as a security agreement if it meets the requirements of a security agreement established in I.C. 26–1–9–203(1). *See Crete State Bank v. Lauhoff Grain Co.*, 195 Neb. 605, 239 N.W.2d 789, 791 (1976). I.C. 26–1–9–203 provides:

(1) ... a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

(a) the collateral is in the possession of the secured party pursuant to an agreement, or the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned;

(b) value has been given; and

(c) the debtor has rights in the collateral.

(2) A security interest attaches when it becomes enforceable against the debtor with respect to the collateral. Attachment occurs as soon as all of the events specified in subsection (1) have taken place unless explicit agreement postpones the time of attaching.

A "[s]ecurity agreement means an agreement which creates or provides for a security interest." I.C. 26–1–9–105(1)(*l*). However, a separate formal document labeled a security agreement is not necessary. *In re Krause*, 114 B.R. 582 (Bankr. N.D.Ind.1988). While there are no magic words required in a security agreement, there must be language in the instrument which leads to the logical conclusion that the debtor intended to create a security interest. *Shelton v. Erwin*, 472 F.2d 1118, 1120 (8th Cir.1973) (no precise words, but there must be some language actually conveying a security interest); *Evans v. Everett*, 279 N.C. 352, 183 S.E.2d 109, 113–14 (1971) (financing statement must clearly manifest debtor's intent to grant, create, and provide for a security interest). Generally, financing statements alone do not create a security interest and may not double as a security agreement, because they do not contain language which can be interpreted as granting, creating, or providing for a security interest. *Id.*[8]

In the present case, the UCC–1 financing statement and Exhibit A do not contain any language which can be construed as actually conveying a security interest in any of Greer's property. Additionally, the box on the UCC–1 financing statement which designates that the UCC–1 was filed in accordance with a security agreement signed by the debtor is not checked. Record at 50. Nowhere is there any evidence of an agreement by Greer to convey, provide, or grant Miles a security interest in his crops. Nor may we infer one, because a security agreement must be in writing and because a financing statement which does no more than meet the requirements of I.C. 26–1–9–402, as is the case here, is merely evidence of creation of a security agreement, does not create a security interest in the debtor's property,

**7.** *See also In the Matter of Bollinger Corp.*, 614 F.2d 924 (3d Cir.1980); *Evans v. Everett*, 279 N.C. 352, 183 S.E.2d 109, 113–14 (1971); *Crete State Bank v. Lauhoff Grain Co.*, 195 Neb. 605, 239 N.W.2d 789 (1976).

**8.** *See also Mid–Eastern Electronics, Inc. v. First National Bank*, 380 F.2d 355, 356 (4th Cir.1967); *Mitchell v. Shepherd Mall State Bank*, 458 F.2d 700 (10th Cir.1972); *Scott v. Stocker*, 380 F.2d 123 (10th Cir.1967); *In the Matter of Carmichael Enterprises, Inc.*, 334 F.Supp. 94 (N.D.Ga.1971), *aff'd*, 460 F.2d 1405 (5th Cir.1972); *In re Dean & Jean Fashions, Inc.*, 329 F.Supp. 663 (W.D.Ok. 1971); *In re Mann*, 318 F.Supp. 32 (W.D.Va. 1970); *American Card Co. v. H.M.H. Co.*, 97 R.I. 59, 196 A.2d 150 (1963); *Kaiser Aluminum & Chemical Sales, Inc. v. Hurst*, 176 N.W.2d 166, 167 (Iowa 1970); *Starman v. John Wolfe, Inc.*, 490 S.W.2d 377 (Mo.Ct.App.1973).

and may not alone serve as a security agreement. *See Evans,* 183 S.E.2d at 113.[9] The standard form UCC–1 financing statement executed here is insufficient to double as a security agreement.

Although, Miles' filing of these documents would have been sufficient to perfect a security interest had one existed, no security interest existed to perfect in this case. Just as a house without a solid foundation will surely fail, so too will a properly filed UCC–1 financing statement without a written security agreement.

Miles failed to comply with the statutory requirements for a security agreement, and as a consequence did not acquire a security interest in Greer's crops. Because Miles did not have a security interest in Greer's crops, Miles does not have a security interest in the $9,995.35 check, proceeds from the sale of Greer's crops to Consolidated. For a security interest to exist in any identifiable proceeds received from the disposition of collateral, there must first have been a security interest in the collateral. *See* I.C. 26–1–9–306.

■ Moreover, Miles' contention that Farm Bureau is estopped from claiming an interest in the check because Greer indorsed the check and gave it to Miles must fail, if for no other reason, because the check is jointly payable to Farm Bureau. Without Farm Bureau's indorsement, the check is not properly payable. *See* I.C. 26–1–3–116 and I.C. 26–1–4–401. Additionally, the funds represented by the check remain in Consolidated's checking account and thus were subject to a lien by Farm Bureau as a judgment creditor. Had Consolidated not listed Farm Bureau as a joint payee on the $9,995.33 check, Miles would have more than likely cashed the check long before Farm Bureau would have had an opportunity to become a lien creditor.

In sum, Miles is an unsecured creditor. As a judgment lien creditor, Farm Bureau

has priority over Miles in the $9,995.33 check. *See* I.C. 26–1–9–301(1)(b). It was contrary to law for the trial court to find Miles had a security interest and priority over Farm Bureau's interest.

*CONCLUSION*

The uncontroverted facts support no reasonable inference in favor of the trial court's finding that Miles had a security interest in the check superior to Farm Bureau's interest. The record leaves us with a definite and firm conviction that the trial court erred in applying the law in finding that Miles was a secured party. Farm Bureau has an interest in the check superior to Miles' interest, albeit, due to Miles' faults and its good fortune.

Judgment reversed and remanded for further proceedings not inconsistent with this opinion.

NAJAM and CONOVER, JJ., concur.

**9.** *See also Mid–Eastern Electronics, Inc. v. First National Bank,* 380 F.2d 355 (4th Cir.1967); *American Card Co. v. H.M.H. Co.,* 97 R.I. 59, 196 A.2d 150 (1963); *Kaiser Aluminum & Chemical Sales, Inc. v. Hurst,* 176 N.W.2d 166 (Iowa 1970); *In re Mann,* 318 F.Supp. 32 (W.D.Va.1970); *In the Matter of Carmichael Enterprises, Inc.,* 334 F.Supp. 94 (N.D.Ga.1971), *aff'd,* 460 F.2d 1405

(5th Cir.1972); *In re Dean & Jean Fashions, Inc.,* 329 F.Supp. 663 (W.D.Ok.1971); *Rutkin Electric Supply Co. v. Burdette Electric, Inc.,* 98 N.J.Super. 378, 237 A.2d 500 (1967); *Central Arkansas Milk Producers Ass'n v. Arnold,* 239 Ark. 799, 394 S.W.2d 126, 128 (1965); *General Electric Credit Corp. v. Bankers Commercial Corp.,* 244 Ark. 984, 429 S.W.2d 60 (1968).